**EXHIBIT 1**

**m.v. Junior M**

**Charter Party dated 29th January, 1999**

**Final Arbitration Award and Reasons**

## IN THE MATTER OF THE ARBITRATION ACT 1996

## AND

## IN THE MATTER OF AN ARBITRATION

**B E T W E E N :** -

FLAME MARITIME LIMITED of Valletta, Malta

Claimants
(Owners)

- and -

M/s. HASSAN ALI RICE EXPORT COMPANY of Karachi, Pakistan

Respondents
(Charterers)

"JUNIOR M"
Charterparty dated 29th January, 1999

-------------------------------------------------

### FINAL ARBITRATION AWARD

-------------------------------------------------

### WHEREAS:

I.      By a Voyage Charter Party on a 1976 Gencon form, with amendments and additions, concluded on the 29th January, 1999 (hereinafter referred to as "the charterparty") the Claimants (hereinafter referred to as the "Owners") agreed to let and the Respondents (hereinafter referred to as the "Charterers") agreed to charter the motor vessel "JUNIOR M" (hereinafter referred to as "the vessel") for the carriage of a cargo of white Pakistani

long-grained rice from Karachi, Pakistan to, inter alia, Moroni in the Cormores Islands in accordance with the terms and conditions more particularly set out in the charterparty.

2. In the event, the cargo could not be discharged in the Cormores Islands and alternative arrangements were made in accordance with the terms agreed in Addendum no. 1. (which was undated and is hereinafter referred to as "the addendum".)

3. The charterparty provided for dispute resolution by way of London arbitration with English law to apply. The relevant clause is quoted below:

*Clause 54*

*"Any dispute arising under this Charter is to be referred to arbitration in London and decided under the Law of England, one arbitrator to be nominated by Owners and the other by Charterers and in case the arbitrators shall not agree, then to the decision of the Umpire to be appointed by them. The award of the arbitrators or the umpire to be final and binding upon both parties".*

The seat of the arbitration was in London, England.

4. Disputes having arisen between the parties due to the delay and then failure to discharge the cargo at Moroni, the Owners appointed me, the undersigned Sonja Fink of 48 Werter Road, Putney, London, SW15 2LJ, England, as the arbitrator nominated by them on the 16th March, 1999.

5. The Charterers were informed of my appointment by fax on the same day. They were asked to appoint their arbitrator. The fax was sent by the Swedish Club, who represented the Owners throughout these proceedings save for my initial appointment, which was agreed with London solicitors, Stephenson Harwood, who were instructed by the Owners.

6. The Charterers remained unrepresented throughout these proceedings. They refused to appoint an arbitrator and initially refused to accept my appointment as arbitrator on the grounds that I lacked jurisdiction to determine the disputes which had arisen under the addendum, as this had allegedly been agreed under economic duress and was therefore the subject of a civil suit filed before the High Court of Sindh in Karachi, Pakistan on 31st July, 1999.

The Charterers subsequently conceded that I did have jurisdiction to

determine their dispute with the Owners under the charterparty but not the addendum thereto.

7. The Owners claim is for unpaid demurrage in the sum of US$ 59,721.35 together with interest and costs. The Charterers deny that any amounts are due to the Owners and have counter-claimed a balance due to them in the sum of US$ 128,464.65.

8. Although the Charterers initially refused to co-operate in the proceedings, they did eventually serve Defence submissions and I am satisfied that they were given every opportunity to participate. For the sake of completeness I have listed below the entire sequence of events and procedural exchanges between the parties and the Tribunal.

Every fax sent to the Charterers or their representatives was also copied to the Charterers' London brokers, Curzon Maritime Ltd.

The Proceedings

9. The Charterers were informed of my appointment by a fax from the Owners on the 16th March, 1999. They were asked to appoint their Arbitrator in accordance with the provisions of clause 54 of the charterparty and were further informed that the Owners sought an urgent arbitration hearing in London, possibly during the course of that week in order to obtain directions from the Tribunal for the proper disposal of the cargo on board the Vessel.

10. At the same time the parties continued to explore a commercial resolution of the dispute which culminated in the addendum which was signed by the Charterers and faxed to the Owners via broking channels on the 1st April, 1999. Unfortunately this did not resolve matters in that the Charterers subsequently refused to abide by the terms of the addendum, alleging that it was agreed to under duress.

11. On the 6th May, 1999 the Swedish Club, sent a fax to the Charterers calling upon them to nominate their own arbitrator as follows:

"............ You will note that clause 54 of the charterparty provides that in the event of a dispute, each party will nominate its own arbitrator in London. Owners appointed Miss Fink as their arbitrator, as indicated to you on 15 and 16 March, 1999. If you are not prepared to accept her as sole arbitrator then we hereby request that you treat this fax as formal notice, pursuant to Section 16 of the Arbitration Act, 1996, giving you 14 days, as calculated from the date of this fax, to appoint your arbitrator, failing which we will give you a formal seven day

Page 4

notice to appoint your arbitrator, failing which, owners will seek Miss Fink's appointment as sole arbitrator.

In the alternative, arbitration can be avoided by you confirming remittance of the outstanding demurrage due as per owners' laytime statement of 20 April 1999."

12.     A further fax was sent by the Swedish Club to the Charterers dated 21st May which read:

"We refer to our fax to you of 6 May 1999, to which we note, with disappointment, that you have failed to respond within 14 days. You are therefore in default of the Section 16 notice contained in that fax by failing to appoint your own arbitrator and inform us that you have done so

As we stated in that fax, we now give you formal notice, pursuant to Section 17 of the Arbitration Act 1996, that you must now appoint your arbitrator and notify us that you have done so, within the next seven (7) clear days (not including Saturdays and Sundays), as calculated from the date of this fax, failing which owners will appoint Miss Fink as sole arbitrator in this reference. We should caution you that it would be foolish of you not to take part in the arbitration as a sole arbitrator can proceed to an award against you in any event, which is enforceable against you.

We therefore look forward to hearing from you as soon as possible."

13.     There was no response from the Charterers and on the 3rd June, 1999, I received a fax from the Swedish Club which was copied to the Charterers, requesting that I accept appointment as sole arbitrator.

14.     I responded by fax on the 4th June, 1999 addressed to both parties informing them that in view of the Charterers' failure to appoint their own arbitrator, I was prepared to act as sole arbitrator pursuant to section 17 of the Arbitration Act, 1996.

15.     The Owners' claim submissions with supporting documents were served by letter dated 2nd July, 1999. The letter was sent to the Charterers under cover of a fax dated 5th July, 1999 and contained a request that the Charterers indicate whether they would be in a position to submit their defence submissions within 28 days of receipt of the letter.

16.     There was no response from the Charterers and so on the 3rd August, 1999, the Swedish Club requested by fax, copied to the Charterers, that:

"......... the Tribunal order that Charterers serve their defence submissions within the next 14 days, as calculated from today, failing which, the Tribunal will then give charterers a final peremptory order for service of defence submissions within a short period thereafter."

17.    I responded by fax dated 4th August, 1999 addressed to both parties in the following words:

"I refer you to the fax from the Swedish Club dated 3rd August, 1999. The Tribunal hereby ORDERS the Charterers to serve their Defence submissions by latest close of business Monday 16th August, 1999. Failure to comply with this order will almost certainly result in a further order in final and peremptory terms for service within a very short timescale thereafter. I look forward to receiving the Charterers' defence submissions with supporting documents"

18.    In response, the Charterers sent me a fax on the 6th August, 1999 which was not copied to the Owners or their representatives. The Charterers' fax read:

"This is with reference to your fax dated August 04, 1999.

This is to inform you that we have filed a civil suit no. 1051/1999 in the High Court of Sindh at Karachi, against the owner of the vessel no M/S. M.S. Shipping Agencies (Pvt) Ltd, Karachi for cancellation of Addendum No. 1 to the charter party of vessel m.v. Junior M as that was obtained under duress and coercion.

The said suit has been admitted by the Honourable Court and the Court was pleased to issue notices to the above Defendants for their replies. The Court notices is (sic) also attached herewith for your information and record."

Attached to the fax was a one page document dated 31st July, 1999 with the heading "In the High Court of Sindh at Karachi", addressed to the Owners and M/s. M.S. Shipping Agencies Pvt Ltd, as Defendants, summoning them to appear in Court on the 23rd September, 1999.

19.    On the 16th August, 1999, I sent a fax to the Swedish Club, copied to the Charterers, as follows:

"I attach a fax dated 6th August, which unfortunately arrived while I was out of the office abroad. In the circumstances, I await your advice as to whether the Owners wish to progress the arbitration.

Would the Charterers reading in copy, please ensure that all communications with me are copied to the Swedish Club who represent the Owners."

20.    The Swedish Club replied by fax copied to the Charterers, on the 17th August as follows:

"Thank you for your fax of yesterday.

Page 6

It is the owners' case that such an action before the High Court of Sindh in Karachi is frivolous and in direct breach of charterers' agreement pursuant to the charterparty and the addendum, the latter being wholly incorporated into and subject to the terms of the charterparty, to refer all disputes arising out of the charterparty to London arbitration, with English law to apply. Arbitration has already been commenced some weeks before this application was made to the High Court of Sindh and claims submissions served by owners. There is also the very clear power given to arbitrators to determine their own jurisdiction. If charterers wish to challenge the bona fides of the addendum then they must do so in London, under English law. It is up to them whether they choose to ignore the arbitration.

Owners therefore request that you make a peremptory order that charterers serve their defence submissions within the next seven (7) days, as calculated from today, failing which the Tribunal will proceed to its award on the basis of the submissions and documents now before it, to the exclusion of all other submissions and evidence that charterers may seek to adduce.

We look forward to hearing from you".

21.    On the 18th August, 1999, I sent a fax to both parties which read:

"I refer you to the fax from the Swedish Club dated 17th August, 1999. The charterparty and addendum thereto provides for dispute resolution by way of London arbitration with English law to apply.

English law provides that an arbitration may proceed to conclusion even in the regrettable instance of a Respondent (yourselves) declining or failing to participate always provided fair opportunity has been given for him to do so.

I therefore now make the following FINAL AND PEREMPTORY ORDER that your Defence to the claim together with any Counterclaim be delivered to me in London with a copy to the Swedish Club representing the Claimant, by latest close of business Tuesday 24th August, 1999, failing which and without further warning I shall proceed to my Award on the documents and submissions then before me and to the exclusion of any other.

I do urge you to take this last opportunity of putting your case before me. If you have any questions as to the arbitration procedure now in hand you should ask me immediately."

22.    The Charterers responded to my Order by fax on the 23rd August, and copied to the Swedish Club which read:

"Suit no. 1051/99 in the High Court of Sindh, Karachi
m/v. Junior M c/p dated 29th January, 1999

Page 7

This is with reference to your fax of August, 18, 1999 on the subject noted above.

We may emphatically state that you have no jurisdiction in the matter. We have filed a suit in respect of the dispute with Flame Maritime before the court of competent jurisdiction in Pakistan. A copy of the plaint filed in this suit is enclosed herewith.

The above case was fixed in court today 23.08.99. Mr Shaiq I. smani Advocate filed Vakalatnama on behalf of Defendant no. 1 Flame Maritime and took time. The case was adjourned at his request. Since the Defendant No. 1 is defending the case here in Pakistan, therefore, you are requested to refrain from proceeding in the matter as it is subjudice before the competent court of Pakistan.

Please carefully note that the matters pertaining to the addendum and subsequent actions/claims thereto being subjudice in the Court of law can not be heard by you until the final decision in the above suit by the Court".

Attached to the fax was a 10 page document which was barely visible in places entitled: "Suit for Declaration Injunction Damages and Cancellation of Document", which I have assumed to be a copy of "the plaint."

23.    The Charterers' fax prompted the Swedish Club to respond by fax to me, and copied to the Charterers as follows:

"We refer to charterers' fax today.

Needless to say, owners do not agree with charterers' allegations. The matter is not sub judice as they claim. Owners' application in Pakistan is, as we stated in our fax of 17 August, simply to stay the action commenced by charterers in Pakistan and have it struck out. Owners are not "defending" any case in Pakistan, nor have they submitted to the jurisdiction of the High Court of Sindh. The Tribunal is aware of the law and jurisdiction clause in the charterparty (clause 54) and that the addendum has been incorporated into the charterparty and is subject to its terms and conditions. In the meantime we submit that the Tribunal should proceed to its award, with or without charterers' submissions and evidence."

24.    On the same day, I sent the following message by fax to the Charterers and copied to the Swedish Club.

"I refer you to both your fax and the Swedish Club's response thereto, of earlier today. Unfortunately the Court papers attached to your fax are very faint and mostly illegible. Please re-send a clearer copy and explain to me by return, why you believe that the arbitration clause contained in the charterparty does not apply to this dispute. In addition, kindly clarify why you are of the opinion that the High Court of Sindh in Karachi is the proper forum for dispute resolution under this charterparty and addendum no. 1 thereto."

25.   I received the following response from the Charterers by fax dated 24th August, 1999 which was not copied to the Swedish Club.

"Ref your fax SF/44/99 of 23 August, 1999. Requested our advocate for clear readable copies. Within 2/3 days upon receipt, we will fax the clear readable court papers, which will be self explanatory."

26.   The following day I sent a fax to the Charterers copied to the Swedish Club which read:

"I refer you to your fax of yesterday. As you know, on the 18th August, 1999, I made an Order in final and peremptory terms for the submission of your Defence and any Counterclaim. You responded by fax on the 23rd August, 1999 stating that you objected to the Tribunal's (my) jurisdiction. Attached to this fax was an illegible copy of the "plaint" filed by you against the owners of the m.v. "Junior M" before the High Court of Sindh in Karachi. Later that day I sent a fax to you with the request that you, inter alia, send me a legible copy of these papers by return. You replied as follows:

"..... Requested our Advocate for clear readable copies, within 2/3 days upon receipt, we will fax the clear readable court papers, which will be self explanatory".

Whilst I fully appreciate that you are of the opinion that I do not have the jurisdiction to render an award in this matter, Sections 30 and 31 of the English Arbitration Act 1996 ("the Act") provide that in the absence of agreement between the parties, the tribunal may rule on its own jurisdiction and that the tribunal has the power to rule on the matter in an award as to jurisdiction or deal with the objection in its award on the merits. Sections 30 and 31 of the Act are quoted in full below.

*"Competence of tribunal to rule on its own jurisdiction*

*30. - (1)   Unless otherwise agreed by the parties, the arbitral tribunal may rule on its own substantive jurisdiction, that is, as to -*

*(a)   whether there is a valid arbitration agreement,*

*(b)   whether the tribunal is properly constituted, and*

*(c)   what matters have been submitted to arbitration in accordance with the arbitration agreement.*

*(d)   Any such ruling may be challenged by any available arbitral process of appeal or review or in accordance with the provisions of this Part.*

*Objection to substantive jurisdiction of tribunal*

*31. - (1)   An objection that the arbitral tribunal lacks substantive jurisdiction at the outset of the proceedings must be raised by a party not later than the time he takes the first step in the proceedings to contest the merits of any matter in relation to which he challenges the tribunal's jurisdiction.*

Page 9

*A party is not precluded from raising such an objection by the fact that he has appointed or participated in the appointment of an arbitrator.*

(2) *Any objection during the course of the arbitral proceedings that the arbitral tribunal is exceeding its substantive jurisdiction must be made as soon as possible after the matter alleged to be beyond its jurisdiction is raised.*

(3) *The arbitral tribunal may admit an objection later than the time specified in subsection (1) or (2) if it considers the delay justified.*

(4) *Where an objection is duly taken to the tribunal's substantive jurisdiction and the tribunal has power to rule on its own jurisdiction, it may -*

    (a) *rule on the matter in an award as to jurisdiction, or*

    (b) *deal with the objection in its award on the merits.*

    *If the parties agree which of these courses the tribunal should take, the tribunal shall proceed accordingly.*

(5) *The tribunal may in any case, and shall if the parties so agree, stay proceedings, whilst an application is made to the court under section 32 (determination of preliminary point on jurisdiction)".*

The reference to Court proceedings is a reference to the English Courts.

The tribunal also has a general duty to inter alia, adopt procedures suitable to the circumstances of the particular case, avoiding unnecessary delay or expense. As you know the Owners seek an award based on their claim submissions and you have failed and/or refused to serve any form of Defence or Counterclaim if applicable other than to object to the substantive jurisdiction of the tribunal by referring me to papers filed before the High Court of Sindh in Karachi, ("the Court papers"), which are unfortunately largely illegible. In taking this stance you have taken the risk that if I find that I do have substantive jurisdiction, an award will be made against you, by default.

I had thought that my fax of the 18th August, made it clear that unless I received your Defence to the claim together with any Counterclaim by latest close of business on Tuesday 24th August, 1999 then I would proceed to my award based on the documents and submissions then before me and to the exclusion of all others.

However as you have yet to provide me with a legible copy of the Court papers, I am prepared to give you until 18h00 on Saturday 28th August, to get the papers to me in London. I would suggest that you either arrange for a courier to deliver the documents to me urgently or that you fax through legible copies. If you fail to get the documents to me by the above-mentioned deadline, I shall make my Award, based on the legible documents and submissions then before me and to the exclusion of all others.

If you have any questions as to the arbitration procedure now in hand you should ask me immediately."

27.    On the 26th August, 1999, I received a fax from the Charterers, which was not copied to the Swedish Club which read:

"Further to our fax SF/24/99 of August, 1999 we herewith fax clear readable copies of Court papers, together with annexures"

and which did have a legible copy of the plaint attached but did not have the annexures.

28.  I therefore sent the following message to the Charterers, copied to the Swedish Club, by fax on the same day:

"I acknowledge receipt of readable copies of the Court papers but WITHOUT the annexures, under cover of your fax dated 26th August, 1999. A copy of your fax together with the Court papers will be copied to the Swedish Club and Curzon Maritime Ltd under cover of this fax.

In view of my deadline imposed for the service of these papers, you have until 18h00 on Saturday 28th August, 1999 to get to me readable copies of any documents annexed to the Court papers. I suggest that you fax through to me legible copies of those documents annexed to the Court papers which I have not already received from the Swedish Club or that you urgently arrange for a courier to deliver the documents to me."

29.  At 15.08 hours on Saturday 28th August, 1999, the Charterers faxed through to me 46 pages of annexures and requested that I acknowledge receipt. This fax was again not copied to the Swedish Club.

30.  I duly did so by fax dated 29th August, 1999 copied to the Swedish Club which read:

"I acknowledge receipt by fax on the 28th August, at 15h08, 46 pages of annexures. For the sake of good order, a copy of your covering fax is being sent to the Swedish Club under cover of this fax."

31.  On the 5th September, 1999, I sent a further fax to both parties which read:

"My fax of the 29th August, 1999 refers. The Charterers' Defence of economic duress raises not just issues of fact but also matters of law. I accordingly, hereby invite you both to provide me with your written legal arguments together with any legal materials and authorities upon which you seek to rely.

Kindly advise me by latest 18h00 on Wednesday 8th September, 1999 as to when you anticipate serving same. Should I fail to hear from you I shall assume that you are content for me to proceed to my award in accordance with my understanding of English law."

32.    The Swedish Club responded with the Owners' further submissions by fax dated 8th September, 1999, copied to the Charterers. The Charterers replied by fax dated 9th September which was not copied to the Swedish Club as follows:

"Dear Mrs Sonja,

Reference your fax dated September 05, 1999.

As we had stated earlier in our faxes that the addendum obtained under duress has been challenged by us for cancellation (sic) is presently subject matter of Civil Suit No. 1051/1999 filed in the High Court of Sindh at Karachi against the Owner and its Agent and the matters pertaining to the addendum and subsequent actions/claims thereto being subjudice in the Court of Law can not be taken by any one until and unless the final decision in the above suit by the Hon'ble Court is arrived at. (sic)

Please note that the matter in the above case is still pending at judication and it will be highly improper if any parallel proceedings or action in relation to the terms of the ADDENDUM in question pending in the Court of law which would miscarriage of justice (sic) and abuse of the process of pending proceedings in the above Civil Suit.

You are, therefore, once again requested to please refrain your self from acting as an Arbitrator to continue with parallel proceedings and any action in this regard by you in such capacity would be at your sole risk as to cost and consequences".

33.    I replied thereto by fax dated 10th September addressed to the Charterers and to the Swedish Club. The fax read:

"I refer you to my fax of the 5th September, 1999. I acknowledge receipt by fax from the Swedish Club of Owners' further submissions as well as a fax from the Charterers dated 9th September which does not appear to have been copied to the Swedish Club and which I therefore attach hereto.

I note the Charterers' request that I refrain from continuing to act as Arbitrator pending adjudication by the Pakistani Courts. I cannot do so. I have a duty to act in accordance with the provisions of the Arbitration Act, 1996, and in particular sections 33 and 34, and in the circumstances, I now intend to proceed to my final award. My award will inter alia, deal with the issue of jurisdiction and will be based on the facts and documents now before me to the exclusion of all others.

As neither party have provided me with legal materials or precedents I shall assume that you are both content for me to apply my knowledge of English law (in particular in relation to the subject of economic duress), unless I hear from you to the contrary by 18h00 London time on Tuesday 14th September, 1999. I will advise you as soon as the award is available for collection.'

34.  This prompted the Swedish Club to send further submissions by fax on the 10th September, copied to the Charterers, which referred to the case of <u>Huyton S.A. v Peter Cremer G.m.b.H & Co.</u> [1999] 1 Lloyd's Rep. 620 in support of their argument that the addendum was not void for duress.

35.  The Charterers replied by sending a fax dated 14th September which was not copied to the Swedish Club which read:

"Please find counter affidavit of CMA No. 6534/99 filed by Syed Shakil Ahmed Attorney on behalf of Owner M/S. Flame Maritime Limited."

Attached to the fax was an unsigned document entitled "Counter-Affidavit to CMA No. 6534/99." The Charterers provided no explanation as to why this document had been sent to me.

36.  On the 15th September, 1999 the Swedish Club sent me a fax, which was not copied to the Charterers which read:

"Owners have inquired of me as to whether charterers have responded and/or provided any legal authorities in support of their allegations. We have received nothing. We should be grateful if you would let us know."

37.  On the 16th September, 1999, I sent a fax to the Swedish Club, copied to the Charterers which read:

"I refer you to my fax of the 10th September, your submissions in response on the same day, and your fax of yesterday which is attached hereto for the benefit of the Charterers.

The Charterers have sent a futher fax to me viz. the counter affidavit filed in the High Court of Sindh in Karachi, which I also attach hereto.

As the Charterers do not appear to wish to make any submissions and in particular in relation to their Defence that the Addendum is voidable for duress, I am now prepared to proceed to my final award on the merits. This will require, inter alia, my determination of the preliminary issue as to whether or not I have jurisdiction to determine the disputes which have arisen. In making my determination I will need to decide whether Addendum No. 1 to the above-captioned charterparty was agreed by the Charterers under duress.

Kindly advise whether you are content for me to proceed accordingly."

38.  The Swedish Club replied by fax on the 16th September (dated the 15th September) stating:

"Owners are happy for you to proceed as set out in your fax today."

39.     The following day I received a fax from the Charterers, again not copied to the Swedish Club which read:

"We thank you for the copy of your fax dated 16 September 1999 and with reference to the third paragraph we will submit our Defence that the Addendum is voidable for duress.

We, therefore, request that you grant us time up to 16.00 GMT 23rd September 1999 for the submission of our Defense (sic)"

Thanking you and best regards".

40.     On the 23rd September I received two faxes from the Charterers containing their Defence submissions without the annexures, which the Charterers' advised had been sent via courier.    The annexures duly arrived on the 29th September and copies were forwarded to the Swedish Club under cover of my letter dated 3rd October.  In the interim I sent the following fax to the Swedish Club and copied to the Charterers, on the 26th September:

"I refer you to your fax of the 15th September, 1999.  Since then I have received a number of faxes from the Charterers, none of which appear to have been copied to you and which I therefore attach hereto.

I have not yet received the courier documents referred to by the Charterers, although I will inform you as soon as they arrive.

Despite my having the Ordered the Charterers to serve their Defence submissions by latest close of business Tuesday 24th August, 1999, you will note that the Charterers have instead chosen to do so now, at this late stage of the proceedings.

These developments raise the issue of whether or not, the Owners are prepared to agree to the late service of the Charterer's Defence submissions.  Of course if the Owners were to agree thereto, then they would be given the opportunity to reply to the Defence submissions and thereafter I envisage proceeding to my final award as quickly as possible.

If the Owners are not prepared to agree, then I will Rule on the matter.

I await your response"

41.     By fax on the 28th September, copied to the Charterers, I received the following response:

"We refer to your fax of 26 September 1999 and note your comments. We are currently seeking our members' instructions and will revert by tomorrow, 29 September."

42.   The following day I received a further fax from the Swedish Club, copied to the Charterers which read:

"We refer to our fax yesterday.

Owners are confused by the submission of charterers' defence, a month later than the deadline was ordered by the Tribunal, and should be grateful for some clarification before owners respond as to whether they accept late service or not. After owners submitted their letter of claim, charterers denied that the Tribunal had jurisdiction to consider and rule on their claim that economic duress had allegedly been perpetrated upon them by owners. We refer in particular to charterers fax to the Tribunal of 9 September 1999. Now they wish to submit a defence to the Tribunal but have made no arguments or pleadings, as far as we can see, in that defence, challenging the jurisdiction of the Tribunal. We should be grateful if the Tribunal would clarify with charterers what their position is in this regard and whether charterers do indeed recognise the jurisdiction of the Tribunal".

This was followed by a fax dated 1st October addressed to me and copied to the Charterers, asking whether the Charterers had replied.

43.   On the 4th October, I sent a fax to the Charterers, copied to the Owners which read:

"I refer you to your faxes of the 23rd September. I confirm that the courier package was delivered to me on the 29th September and that I have copied the documents and forwarded them today to the Swedish Club.

I also refer you to the faxes from the Swedish Club dated 29th September and 1st October. Please advise me by return whether you continue to challenge my jurisdiction. If so, do you wish to add anything to your Defence submissions, insofar as they are silent on this issue?

I await your prompt response."

44.   On the 5th October, the Swedish Club sent a further fax copied to the Charterers which read:

"We refer you to your fax yesterday to charterers, copied to us, for which we thank you.

Owners note with disappointment that, despite their efforts to be transparent in resolving this matter, it is apparent that charterers do not reciprocate. Confusion still exists as to charterers' views and actions, even as to the point of whether they accept the Tribunal's jurisdiction or not, despite their having agreed to submit any disputes arising out of the charterparty to arbitration in London with English law to apply. Charterers have failed to respond to the Tribunal by the expiry of every time limit that has been given by the Tribunal and continue to delay responding.

Owners, in particular, refer to charterers' fax of 9 September 1999 and simply state that this course of action/behaviour is unacceptable in the course of commercial arbitration.

Charterers have been given every opportunity to participate in and defend themselves before and under the proper jurisdiction by both owners and the Tribunal, but for reasons best known to themselves, failed to produce a defence within the time stipulated.

Owners therefore do not agree to the late service of charterers' defence in this matter and respectfully request that the Tribunal proceeds to its award on the basis of the submissions and evidence before it, to the exclusion of charterers' defence and supporting documents served on 23rd September, 1999. We note incidentally that we have still not received the latter."

45.   In response thereto the Charterers sent a fax on the following day, this time copied to the Swedish Club. It stated:

"We thank you for your fax dated 4th October, 1999 and in this connection refer you to the last sentence of c/p clause 43 which reads as follows:

*Demurrage/despatch, if any to be settled within 30 days after submission of documents upon completion of discharge.*

These documents were only received by us on 5 July 1999 together with owners claim which they submitted to you. This was a breach of the c/p clause no. 43.

With our fax dated 23rd September to you, we have enclosed our time sheet of m.v. Junior M together with our summary of payment and disbursements from which you will notice that "in charterer's favour is US$ 128,461.65 based on the principles in English law that:

*In accordance with English law the calculations for the discharge ports should take the form of one overall calculation for the entire cargo, not separated for the quantity of cargo discharged at each port.*

Page 16

We object to the owners referring to arbitration before they had fulfilled the terms and conditions of c/p clause 43. However, we have no objection to you arbitrating on our claim of US$ 128,464.65 due to us from owners.

With regards to the addendum to the charter party, we maintain that this is subjudice in suit no. 1051 of 1999 in the High Court of Sindh at Karachi and this has been confirmed in paragraphs 4 and 5 of owner's counter-affidavit, a copy of which was faxed to you on 14-09-99".

46.    This was followed by a further fax from the Charterers on the 6th October copied to the Swedish Club, which read:

"We refer to our fax dated 5th October 1999 a copy of which we attach for your easy reference.

Please note that we do not agree with the contention raised in the last paragraph of the Swedish Club's fax dd 1999-10-05 as they were in breach of c/p clause no. 43 and the relevant documents were only received by us on 5th July 1999 together with a copy of their claim which they submitted to you.'

47.    On the 12th October, I made my ruling. This was conveyed to the parties, by fax as follows:

"I refer you to the Charterer's faxes dated the 5th and 6th October and the Swedish Club's fax dated 5th October, 1999.

Although I fully understand the Owner's decision not to agree to the late service of the Charterer's defence submissions, the final decision on this matter rests with me.

After careful consideration and having weighed up the potential prejudice which might be suffered by each side, I have decided to allow the Charterer's submissions. I recognise that this may delay the proceedings but I hope to be able to keep any further delay to a minimum.

I also appreciate that the Owners may now wish to respond to the Charterer's defence submissions and if so then please inform me as soon as possible. Of course, if the Owners would like me to proceed to my award, then I shall do so".

48.    The Swedish Club responded thereto by advising me that they wished to submit brief reply submissions, which were duly served by fax on the 14th October, 1999.

49.    On the 21st October, 1999 I informed the parties that I intended to proceed to my award.

50. On the 25th October, the Charterers sent a further fax (dated 22nd October and again not copied to the Swedish Club) which read:

> "We acknowledge receipt of your fax dated 21 October 1999 and the couriered package from the Swedish Club ref 1/19980098 DH/CLS-FD&D dated 1999-10-15 enclosing a copy of their final submissions dated 1999-10-14. On page 4 under 2(a), the Swedish Club have stated that the laytime and demurrage calculations for the other Madagascan discharge ports were sent to Charterers on 20th April. This is not correct and from the fax dated 20 April, you will notice that neither was this fax addressed to us nor was a copy marked for us.
>
> The Owners were therefore in breach of clause 43 of the charter party when they submitted their claim to you in July 1999".

51. I forwarded the Charterer's fax to the Swedish Club and asked them if they wished to comment thereon. They duly did so by fax on the same day, copied to the Charterers, in which the Owners denied the Charterers assertions and continued to "maintain their submissions as previously set out."

52. Further correspondence was exchanged regarding whether or not the Owners' laytime and demurrage calculations were sent to the Charterers on the 20th April via broking channels, and on the 10th November, 1999 I sent the following fax to the parties:

> "It is customary in English arbitration proceedings for the Claimant "to have the last word" as per the Swedish Club's fax dated 4th November, 1999. I now regard the submissions as closed. I will proceed to my final Award at my earliest convenience and will inform you both as soon as it is available for collection."

### The Facts

53. The vessel was fixed on the 29th January, 1999 to carry a cargo of approximately 9,000 m.t. of bagged white Pakistani long-grained rice from 1-2 safe berths, Karachi to 1-2 safe berths in Antisirinana, Moroni and Mahajunga. The Charterers were given the option to nominate a third port of discharge of either Mahajunga or Anjuan, with such option to be declared on latest sailing Karachi. The discharge ports had to be in geographical rotation.

54. The vessel arrived in Karachi on the 2nd February and having loaded the cargo sailed for Antisirinana, her first discharge port on the 5th February, 1999. The following bills of lading were issued:

a) B/L No. KHI/001/99 in respect of 2,000 metric tonnes of bagged rice for discharge at Antsirinana

b) B/L No. KHI/002/99 in respect of 5,000 metric tonnes of bagged rice for discharge at Moroni, and

c) B/L No. KHI/003/99 in respect of 2,000 metric tonnes of bagged rice for discharge at Mahajunga

55.  On the 13th February, 1999 the Charterers asked the Owners' for permission to discharge the cargo destined for Mahajunga at Moroni. The Owners agreed thereto.

56.  Having discharged 2,000 m.t. of rice at the first discharge port of Antsirinana, in Madagascar on the 21st February, 1999, the vessel proceeded to the second discharge port of Moroni in the Cormores Islands. By now, the parties had agreed that Moroni was to be the final discharge port and the freight due had been calculated accordingly.

57.  Unfortunately upon arrival at Moroni on the 22nd February, 1999, the vessel was not allowed to discharge her cargo as the cargo receivers had failed to obtained the relevant permission from the government authorities in the Cormores Islands. The reason for the government's refusal to allow the cargo to be discharged was not explained in these proceedings. On the 24th February, 1999, the vessel was ordered by the government authorities to leave the territorial waters of the Cormores Islands.

58.  The vessel remained off Moroni for several weeks whilst the Charterers attempted to resolve the problem with the cargo receivers. On the 12th March, 1999, the Charterers asked the Owners whether they would agree to discharge some of the cargo in Mahajunga with the balance of the cargo to be discharged at a fourth port viz. Tamatave.

59.  However one wishes to categorise the discussions which followed (the Owners refer to them as negotiations which the Charterers dispute) an addendum to the charterparty was agreed to by the Owners and the Charterers on the 17th March, amended on the 18th March and eventually signed by the parties on the 1st April ("the addendum".)

60.  The precise chronology of events between the 22nd February, 1999 and the completion of discharge at Tamatave is set out in some detail later on in the Award.

Page 19

61.    The relevant clauses in the charterparty and the entire addendum are quoted below. (The notice from Stephenson Harwood dated 18th March, 1999 which was incorporated into clause 6 of the addendum was misnumbered.)

61.1    <u>The Charterparty</u>

Box 10.  *"Freight rate ...*
*US$ 30.50 PMT FIOS BASIS 1/1*
*US$  1.50 PMT EXTRA ON ENTIRE CARGO FOR EACH ADDITIONAL DISCHARGE PORT USED."*

Box 11.  *" Discharging port or place (Cl.1)*
*1-2 SAFE BERTH(S), ANTSIRANANA, MORONI, MAHAJUNGA CHOPT TO DISCHARGE AT MAHAJUNGA OR ANJUAN"*

Box 18 referred to clause 43.

Box 20.  *"Brokerage commission and discharging*
*6.25% percent commission total for division"*

Clause 7.  *"Demurrage  See clause 43*
*Demurrage at the rate stated in Box 18 per day or pro rata for any part of a day at ports of loading and discharge."*

Clause 14.  *"Brokerage on gross freight/demurrage*
*A brokerage commission at the rate stated in Box 20 on the freight earned is due to the party mentioned in Box 20"*

Clause 15.  *"GENERAL STRIKE CLAUSE*

*Neither Charterers nor Owners shall be responsible for the consequences of any strikes or lock-outs preventing or delaying the fulfillment of any obligations under this contract. ............*

*If there is  a strike or lock-out affecting the discharge of the cargo on or after the vessel's arrival at or off port of discharge and same has not been settled within 48 hours, Receivers shall have the option of keeping vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging, or of ordering the vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after Captain or Owners have given notice to Charterers*

Page 20

of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charterparty and of the Bill of Lading shall apply and vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion".

Clause 30.  "Notice of readiness to be tendered in writing during office hours only (0900 hours to 1700 hours Monday to Fridays and 0900 hours to 1200 hours noon on Saturdays) to buyers and agents at discharge ports, laytime time (sic) to count 0800 hours next working day"

Clause 31.  "Cargo to be discharged free of expense to the vessel at the average rate of 750 metric tons (provided vessel can deliver at this rate) basis at least 3 hatches at the commencement of discharge (if less than 3 hatches are available discharging rate to be reduced pro-rata) per weather working day of 24 consecutive hours. Time from Friday 1700 hours to Monday 0800 hours and from 1700 hours on a day preceding a legal or local holiday until 0800 hours next working days not to count even if used"

There is a discrepancy between the two photocopies of the charterparty submitted to me, insofar as the copy submitted by the Charterers states at Clause 31:

"....... Time from Saturday noon to Monday 0800 hours and from 1700 hours on a day preceding a legal or local holiday until 0800 hours next working days not to count even if used."

Clause 32.    "Discharge ports to be declared latest on sailing from Karachi".

Clause 33.  "Discharge ports always to be in geographical rotation".

Clause 34.  "Cargo to be released only against proper Bills of Lading, and in case these are not available at discharge port on vessel's arrival then Charterer's to provide a LETTER OF INDEMNITY in Owner's P & I Club wording signed by Charterer's and consignee".

Clause 37.  "100% freight payable per metric ton intaken bill of lading weight basis FIOS within 5 banking days of signing and releasing of bills of lading marked 'Freight payable as per C/P'....... Charterer's privilege to deduct brokerage, commissions, and indisputable Despatch money, if any, at load port. ......"

Clause 43.  *"Demurrage US$4000 - Half Despatch working time saved at load port and Demurrage US$ 4,750 - Half Despatch working time save at discharge ports.  Despatch money at half demurrage rate on working time saved both ends.  Demurrage/Despatch, if any to be settled within 30 days after submissions (sic) of documents upon completion of discharge".*

Clause 49.  *" ......Owners warrant that the vessel has not entered and will not enter any port in violation of any applicable restrictions of any government having jurisdiction".*

Clause 55.  *"Discharge port rotation: ANTISIRANANA about 2,000 m.t. and MORONI about 5,000 m.t. and MAHAJANGA or ANJUON about 2,000 m.t. At 2nd and/or 3rd disport time to count immediately on arrival if vessel arrives within office hours, otherwise to count from commencement of the next working period."*

61.2   The Addendum

"IT IS HEREBY MUTUALLY AGREED:

1.   Detention is to be paid immediately at a rate of US$ 4,750 per day PLUS bunkers consumed at US$ 600 per day from arrival at Moroni on 22 February 1999 until conclusion of the agreement and receipt of funds into Owners bank.

2.   Demurrage incurred at the first discharge port, Antisiranana, of US$10,117 is payable as agreed by Charterers immediately.

3.   Freight at US$ 1.50 per MT on entire quantity of cargo i.e. 9,032 MTS for each discharging port of Mahajunga, Antisiranana/ Tamatave to be paid in advance immediately.

4.   Disbursement accounts at all discharge ports to be settled by Charterers including port disbursements and agency fees (excluding Owners items).

5.   FRF 89,814 was advanced to agents at Moroni on account of disbursements.  Owners request that this is paid by Charterers to Owners and Owners subrogate their rights to and authorise Charterers to request re-imbursement from agents.

6.   New bills of lading are issued in relation to cargo to be taken to each discharge port forthwith.  The old original bills of lading for

Page 22

Moroni and Madagascar are returned to Owners for cancellation forthwith. No LOI(s) will be accepted. In addition the notice from Stephenson Harwood dated 18th March 1999 is hereby deemed incorporated into this Addendum and Charter Party and a copy of this notice is attached hereto and the content of which hereby quoted.

*We hereby give you notice of the proposals acceptable to Owners in relation to the bills of lading as follows:*

1.     *Bill of Lading No. KHI/003/99 for 2,000 m.t. of rice will be couriered from Moroni to Mahajunga to await the vessel's arrival in international waters off Madagascar. The Receivers must agree in writing to the change of destination.*

2.     *Bills of Lading No. KHI/002/99 for 5,000 m.t. of rice to be discharged in Antisiranana and Tamatave respectively to be cancelled forthwith, and new bills issued for Antisiranana and Tamatave. The old bills of lading to be returned to the Swedish Club, London for cancellation.*

3.     *In relation to all the above bills of lading, the vessel will not proceed into the discharge ports until Owners' correspondent/agent has checked the original bills of lading.*

4.     *In the event that new bills of lading are not issued, and the old bills of lading are not cancelled in accordance with clauses 1 to 2 above, the agreed detention rate as set out in clause 1 of Owners' counter-proposals dated 16th March, 1999 will continue to be payable by Charterers to Owners upon notification by Owners to Charterers of the vessel's arrival in international waters off the discharge port, or as close as reasonably practical thereto, until issue of the new bills of lading and receipt and cancellation by the Swedish Club, London of the old bills of lading.*

5.     *All cargo receivers, including the First National Bank of Chicago, to confirm their agreement to these terms and authority to issue the new bills of lading.*

*All other terms and conditions of the charterparty dated 29th January 1999 as amended by the counter-proposals dated 16 March 1999 to remain unchanged and in full force."*

7.    The existing charterparty terms in relation to laytime and demurrage remain in force with the exception of the laytime in the discharge ports where laytime is to be 750 MT per day or pro rata, not per weather working day, and time is to start counting upon arrival at the first discharge port.

8.    The above is to be incorporated into an addendum to the existing voyage charterparty. The addendum to be in a form acceptable to owners in their absolute discretion.

9.    Charterers, Hassan Ali Rice Company, traders, Zinc and Triest, consignees named in the bill of lading at Moroni, S.I.R., to provide a statement holding Owners/the Vessel harmless for any and all consequences for the delay and change of destination/delivery of cargo and owners/the vessel to be held harmless for any problems/delays arising out of the existing separation in the holds of the cargo, which separation was ordered and fitted in accordance with and pursuant to Charterers' instructions at the load port of Karachi. This hold harmless letter does not give the right to Charterers and/or any other party to issue a Letter of Indemnity in relation to either non-production of original bills of lading and/or changes of destination. We repeat that no LOIs will be accepted by Owners."

62.    In accordance with the terms of the addendum, the Charterers instructed the Owners to order the vessel to discharge the remaining cargo on board at Mahajunga, Antisirinana and Tamatave.

63.    The allowed laytime expired during the course of discharging at Antisirinana and Tamatave. The Owners subsequently calculated that they were owed demurrage in an amount of US$ 59,721.35 in accordance with their laytime statement dated 20th April, 1999, but despite demand, the Charterers have refused to pay and have counter-claimed an amount of US$ 128,464.65.

64.    <u>Chronology of Events</u>

22/2/99    The Charterers informed the Owners via broking channels that they had been advised that another vessel with

Page 24

Japanese aid cargo on board would be arriving in the Cormores islands and asked the Master of the "JUNIOR M" to request a priority berth.

The vessel arrived at Moroni either on the 22nd February or the 23rd February and proceeded to the anchorage. (The precise date and time of arrival cannot be ascertained from the papers before me.)

23/2/99    A fax from the Owners' agents was forwarded to the Charterers, which read:

"Please be informed that above vessel arrived this morning but it seems that there is a problem between the receiver and the government to the point that we got instructions not to let anchor the vessel.

Please find a copy of the letter of the government.

We hope that this problem will be resolved soon "

The Charterers notified Messrs. Zink and Triest SARL, Paris whom the Charterers describe as their principals and who appear to have been the shippers and sellers of the cargo.

The Owners' managers sent a fax to the Charterers via broking channels and copied to Zink & Triest SARL in Paris, which, inter alia, reserved the Owners' rights and held the Charterers fully liable for any and all consequences, of the delay.

24/2/99    The Owners' agents in Moroni received letters from the Ministry of Economy and another agency denouncing S.I.R.'s (the consignees) import contract and ordering the suspension of discharge. The vessel was ordered to leave the territorial waters of the Cormores Islands.

The Charterers received a fax from Zink and Triest SARL which stated inter alia:

"I need your help concerning several issues in Moroni:

1. Please instruct the vessel to stay at between 8 and 12,000 (sic) nautic (sic) miles from the port. We should get a final decision from the government tonight.

.......

4. Please confirm to the shipowner that we still have the authorization to unload, but they want the second vessel to unload first. Please also confirm to them that they are in the port but cannot unload as a category of the dockers are on strike. They indeed want the M/V Junior M to unload first".

There was no strike.

25/2/99    By fax to the Owners' managers, the Charterers claimed that all documentation regarding the Notice of Clearance was in order and instructed the vessel to "discharge cargo immediately upon berthing at our risk". The Owners refused and by fax to the Charterers, demanded proof "in the form of the NOC from the government and/or direct confirmation from the government agency that everything is in order". They also reserved "their rights in respect of any and all other costs incurred in keeping the vessel" at the Charterers' disposal and requested remittance details in respect of the balance of freight.

In a subsequent fax from the Swedish Club on the same day, the Charterers were advised that the Owners considered the vessel to be on detention as from 22nd February and that damages at a reasonable daily rate would continue to accrue until the matter was resolved. The fax concluded with the words:

"We and owners look forward to receiving your proposals to resolve the current situation and your further instructions pursuant to your duties under the charter party by return."

On the same day the Swedish Club sent a further fax to the Charterers which read:

"We refer to our two faxes today to which we have still not received a reply.

Please note that if we do not receive a written response from you by 10.00 am Greek time Friday 26th February 1999 confirming

that the vessel will be allowed to enter the port and commence discharging, the owners fully reserve their rights to take all steps they consider necessary to resolve this situation including but not limited to taking the cargo off the vessel by whatever means necessary."

26/2/99          The Swedish Club sent a further fax which inter alia, contained the following:

"We refer to our telephone conversation earlier today.

We note your comments that the government authorities in Moroni have verbally confirmed to the port authorities that the vessel should be allowed into the port to discharge today and that you are now trying to obtain written confirmation which can be passed onto the members. We await confirmation that the written authority from the government has been obtained and that a copy of such authority will be passed to our members as soon as possible.

We also note your comments that the vessel will be on demurrage as a result of this incident. We also understand from our members that demurrage has been earned from the first discharge port and they are still waiting to receive the balance freight. Please could you confirm in writing by return fax that the vessel will be on demurrage and/or detention from 22nd February 1999 and that all other costs and expenses incurred by our members as a result of this incident will be settled in accordance with your obligations under the charter party."

In addition a request was made for voluntary security in favour of the Owners, supported by a first class European Bank guarantee. The fax concluded with the following words:

"Finally, please note that if our members do not receive written authorisation from the Comores Government and port authorities allowing the vessel to enter the port to discharge by 5.00pm Greek time today, we reiterate our member's position as per our previous faxes to reserve all their rights in respect of this fixture and to seek alternative means of taking his cargo off the vessel."

The Charterers' brokers responded by fax to the Swedish Club, which stated, inter alia, that the cargo receivers were "trying their best to get the written confirmation from government authorities" and that they hoped to be able to

get the authority that day.

They advised that the balance of the freight had already been remitted and that "details of remittance have already been passed to Owners through brokers.   FYI balance freight was remitted ..... on 24th February, 1999."  Insofar as detention charges were concerned, the Charterers stated:

"As per C/P clause 31, laytime allowed to discharge the said cargo about 15/16 days and FYI, as per C/P clause 43, DEM/DESP to be settled within 30 days after submission of documents upon completion of discharging. Further more please note vessel arrived Moroni on 23rd Feb, 99 and as per C/P clause 31 laytime allowed to discharge 7000 MT BGD rice in abt. 9 days plus holiday EIU.

We don't seem to understand why Owners are asking Charterers for unnecessary detentions from Charterers ....."

27/2/99     According to the Owners they received a fax from their agents confirming that the order to refuse discharge was final and irrevocable.  The order was given by a decision of the Council of Ministers.

1/3/99     Following a telephone conversation between the parties, the Charterers asked the Owners to liaise directly with the consignees of the cargo, Messrs. S.I.R. and/or Zink & Triest.

The Swedish Club responded by fax (incorrectly dated 26th February) which read:

"We refer to our recent correspondence in this matter.

We understand from our members that the authorities in Moroni reconfirmed over the weekend that the vessel would not be allowed to enter the country and discharge the cargo.  In this respect, there now appears to be considerable doubt as to whether this contract can be fulfilled. As you know, the cargo is perishable and the vessel cannot wait around indefinitely.  As one week has passed since the vessel tendered NOR and the government has twice confirmed that the vessel will not be allowed to enter the country, our members hereby request you to suggest alternative arrangements for discharging this cargo.  If we do not receive your alternative proposals by 1.00pm Greek

time today, our members reserve their rights to seek alternative means of discharging this cargo.

Further, we have received a copy of your fax today (ref: Tomm1/01/99) to our members requesting them to liaise with a third party. With all due respect, our member's only contractual relationship lies with you through the charter party therefore any instructions must come from you.

Finally please note that our members have still not received the outstanding and overdue balance of freight and we are disappointed that this blatant breach of contract has not been rectified despite assurances from you that it would be settled. We hereby reserve our member's rights in this regard"

This fax arrived after the 1.00 pm deadline imposed.

The Charterers replied by fax in which they stated that the Owners' information regarding the vessel's prospects of discharging at Moroni, was incorrect and attached a fax from S.I.R. which read:

"I have seen the Prime Minister and all his advisers on Saturday and Sunday. The result of all the meetings is that the government say that "on the cabinet of Thursday 4 March, they are going to give the official authorization to MV JUNIOR M to lay up the ship". Normaly the ship start discharging on Saturday if the donation boat have finish". (sic).

The Charterers also advised that the balance of freight in the amount of US$ 10,366 had already been remitted to the Owners.

2/3/99    The Charterers asked the Owners to instruct the Master to wait 8 to 12 nautical miles from the port. They stated that "the consignees have with them authorisation to unload ..."

By fax from the Swedish Club, the Owners refused the Charterers request, in the absence of proper notification from the authorities that the vessel had permission to enter territorial waters, and they continued to call for urgent instructions as to alternative discharging arrangements. They also again reserved their rights for all losses which they might incur due to the delay.

Page 29

3/3/99          The Owners' P & I club correspondents advised them that
                it would not be possible to exercise a lien over the cargo in
                the Cormores Islands.

4/3/99          At the Cabinet meeting that day the government in Moroni
                refused to revoke its prohibition on discharge.

5/3/99          In response to a fax from the Charterers to the Owners, the
                Swedish Club again asked the Charterers "to acknowledge
                liability in writing by return fax for our member's losses
                together with your in principle agreement to put up
                voluntary security for our member's claim backed by a first
                class European bank guarantee". A deadline of 3.00pm
                Greek time was imposed failing which they would "take all
                steps necessary to protect our member's interests including
                and not limited to securing their claim without further
                reference" to the Charterers.

                The fax went on to provide:

                "Finally, we note your comments that the port authority will
                today issue some kind of authority for the vessel to enter Moroni
                and discharge. Please note that our members were ordered to
                send the vessel out of the territorial waters by the Cormoro (sic)
                government on the basis that the sale contract of SIR had been
                denounced. Consequently, the vessel will not enter the territorial
                waters of Comoro (sic) until the members have received copies
                of the following executed official government orders:

1.              An order from the Ministry of Transport that the original
                decision/order of the Council of Ministers denouncing the sale
                contract is revoked;
2.              An order from the Ministry of Economy revoking their previous
                order to the receivers requesting them to stop the importation of
                the cargo; and
3.              An order from the appropriate government authority that the
                original government order forcing the vessel to leave the
                territorial waters is revoked and that the vessel will now be
                authorised to enter the territorial waters of Comoro and the port
                in order to discharge".

                This fax was only received by the Charterers after the 3.00
                pm deadline imposed. The Charterers replied by fax
                stating that they would respond on Monday the 8th March.

Page 30

However they went on to state:

"We must however inform you that that vessel arrived off Moroni on 23/2 and in accordance with c/p rider clause 30, laytime commenced on 24 Feb. 1999/08.00 and as per C/P 31 laytime allowed is more than 9 days whilst Monday 8/3 is on the eighth day. Also as per C/P 43 demurrage, if any, is to be settled within 30 days after submission of documents upon completion of discharge".

8/3/99    The Owners received a fax from the Charterers via broking channels which read:

"It has been advised by the cargo owner that permission for entry of the vessel into Moroni port in writing is still awaited and may take further 4 - 6 days.

As such in order to avoid further demurrage the cargo owner has advised to approach owner's for alternate arrangement for discharging into 1 - 2 ports in Madagascar.

Therefore, kindly advise owners consent for same and advise."

9/3/99    In an attempt to break the impasse, the Owners made a "without prejudice" offer to discharge the cargo in Madagascar subject to a number of terms. The fax read:

"We refer you to your fax of 8 March 1999.

We are extremely concerned to note that contrary to your assurances the situation remains unchanged and a government order remains in place preventing both the entry of the vessel and the discharge of the cargo at Moroni. This situation cannot be allowed to continue and it is sufficient (sic) to state that the order to discharge the cargo "may take further 4-5 days". We therefore reserve all owners' rights generally as a result of charterers and receivers failure to take delivery of the cargo including all additional costs incurred whilst the vessel has waited off the port.

Furthermore, we consider that your suggestion that the cargo be discharged 1-2 ports in Madagascar is in breach of the terms of the charterparty. You have solely nominated 2 ports and paid freight for 2 ports. You are therefore not entitled to nominate any additional discharge ports.

However, without prejudice to the above and in an attempt to resolve the current problems on an amicable manner we are prepared to discharge the cargo in Madagascar on the following basis:

1. Immediate settlement of demurrage earned at Antsiranana. Relative statement showing demurrage US$ 10,117.69 submitted to you thru brokers 26.02.99.

2. Immediate settlement of detention costs of abt. USD 108,000 (detailed statement will follow) running as from arrival Moroni Mond. 22.02.99 21.00 hrs uninterrupted until conclusion of any eventual agreement.

3. Immediate refund of USD 15,272.35 being disbursements at Moroni which owners remitted to agents and they are now unable to recover (owners subrogate charterers for above).

4. Conclude a time charter party with delivery off territorial waters Moroni. Redelivery on dropping outwards sea pilot one port Madagascar namely Antsiranana.

5. T/charter hire USD 6,000 day (sic) net including overtime paid in advance for 20 days which owners estimate to be the time needed to conclude the discharging AGW/WP.

6. T/charterers to pay in advance along with the T/C hire the estimated bunkers (IFO 180 CST. MGO) consumption.

7. T/C charterers to provide suitable performance guarantee issued by a first class European bank, approved by owners, with English jurisdiction/wording to be agreed.

8. Suitable L.O.I. countersigned by first class European bank, approved by owners, with English jurisdiction (wording to be agreed) reflecting new destination/consignees.

9. Suitable guarantee countersigned by first class European bank approved by owners, with English jurisdiction by which owners will be held harmless for any consequences including but not limited to any possible inconvenience/problem that present receivers S.I.R. might create including possible cargo deterioration due to prolong (sic) storage on board (wording to be agreed)."

10/3/99        The Charterers sent a fax to their brokers which read:

" .... Owner's proposal is rejected as being "totally unacceptable and unreasonable and we request you to advise Owners to come back with a proper and reasonable proposal".

The Charterers' brokers sent a fax message to the Owners' brokers which stated inter alia:

"Entre nous these Owners seem to be hell-bent on screwing the

Page 32

Charterers without any reason.

Charterers are quite prepared to let the ship sit where it is but in good faith asked and I do repeat 'asked' Owners as a matter of courtesy if they (Owners) would let the vessel go to Madagascar since the charterparty was originally fixed on the basis of Moroni completing Madagascar.

Owners demands are unrealistic and totally unreasonable and I think you as their brokers should exercise some influence in this matter before it gets quite out of hand. How do Owners arrive at these unjustifiable demands? They have been difficult all along without any justification and frankly are making no attempt to come to some sort of amicable and reasonably commercial arrangement

I look to you please to get Owners to revise their stand and allow this cargo to be discharged in the best possible fashion to the benefit of all parties rather than the Owners.".

11/3/99    The Swedish Club sent a fax to the Charterers placing the Charterers on formal notice:

".... that owners regard you to be in breach of contract by your failure to discharge and deliver the cargo and therefore request that discharge and delivery of the cargo commence immediately, and certainly no later than the end of tomorrow 12 March 1999. Please confirm, by the giving of such instructions, that you intend to honour the charterparty terms and your obligations thereunder...."

12/3/99    A further fax was sent by the Swedish Club reminding the Charterers that the Owners expected to hear from them in relation to instructions for delivery of the cargo at Moroni, by close of business that day.

(Some of the exchanges between the parties are marked "without prejudice". However as they are referred to by both parties in their submissions, I too shall refer to them).

The Charterers sent a fax to the Owners' managers which read:

"Reference your msg no. 2259 dated 9th March, 1999.

Page 33

Owner's demands are totally unreasonable and unacceptable to us.

As you are well aware that we and the cargo receivers are trying to resolve the matter in an amicable way but at the same time we need owners patience/support also.

As per C/P dated 29/01/99, vessel was fixed basis 3 disch port i.e. Antsiranana, Moroni and Mahajunga and now chrs desire to call the vessel at third disch port Mahajunga where we desire to discharge 3000 tons. The owners of the cargo, Zink & Triest SARL desire to use an additional port Tamatave to discharge the balance 4000 tons and we will pay as per C/P for an additional used port.

Furthermore, please note charterers will pay owners freight for third disch port as per C/P.

Regarding owners claim for demurrage as per C/P clause 43, DEM/DESP is any to be settled within 30 days after submission of documents upon completion of discharging.

We appreciate Owners response to revise their stand.

For the 18 days detention at Moroni, the owners of the cargo will pay you at US$ 4000 per day i.e. USD 72,000 - which they will remit to you within 5 working days after your acceptance of this proposal".

Lawyers acting for Zink & Triest S.A.R.L. wrote to the Swedish Club asking for their and the Owners' co-operation to resolve the matter so as to avoid legal action.

15/3/99

By fax from the Charterers' to inter alia, the Owners' managers, the Charterers stated:

"We again reiterate that chrs are not in breach of charter party. Please note as per box 13 vessel was fixed for 3 disch ports and owners have already been paid for two disch ports.

After discharging abt. 2000 mt. at Antsiranana there is balance cargo of abt. 7000 on board and chrs hv not yet utilized second disch port at Moroni, due to government intervention. This constitutes "force majeure" and therefore chrs are not in breach of C/P but in order to over come this and mitigate losses chrs

have reasonably requested owners to sail to Madagascar so as to disch the cargo.

In the event owners are entitled to ask for reasonable compensation for the time sitting off Moroni to be reimbursed as chrs had already declared their discharging option and therefore this request must be considered.

C/P has no detention clause except for demurrage which chrs have agreed to pay. Chrs have already proposed to pay for waiting time at Moroni to Owners which is time counting as per C/P as balance cargo still on board to disch.

Therefore kindly instruct Master to proceed to Mahajunga."

On the same day Zink & Triest SARL asked the Charterers to check with the Owners whether it would be possible for the vessel to proceed to 3, rather than 2, ports in Madagascar.

The brokers took over the negotiations and that evening the Owners' solicitors, sent a fax to the Charterers alleging that the Charterers were in breach of their obligations under the charterparty and the bills of lading. The Charterers were informed that the Owners intended to appoint me as their arbitrator and they called upon the Charterers to nominate their arbitrator by no later than 12.00 hrs (UK time) Tuesday 16th March so as to fix an urgent hearing in London in order to "determine directions for the discharge and delivery of the cargo, or alternatively propose a commercial solution acceptable to our clients." This fax was copied to, inter alia, Messrs Zink & Triest SARL and went on to state:

"In the event that we do not hear from you within the above deadline, we put you on notice that we shall make an application forthwith to the English High Court pursuant to Section 44 of the Arbitration Act 1996 for the proper disposal of the cargo.

We reserve all our clients rights generally in respect of both Charterers and Receivers failure to discharge and take delivery of the cargo and produce the original Bills of Lading including all additional costs incurred whilst the vessel has waited off Moroni".

Page 35

16/3/99            The Charterers sent a fax to Zink & Triest S.A.R.L. which
                   stated, inter alia:

                   "From the opinions I have obtained about this case, it appears
                   that owners have built up their case for "frustration of the
                   discharge of the cargo at Moroni" and are now in the "driver's
                   seat". Further delay will only increase the costs."

                   Zink and Triest SARL replied as follows:

                   "Settle this. They are in "driver's seat". As you said, further
                   delay will only delay cost (sic). We will work out accounts
                   between ourselves later."

                   Further discussions ensued culminating in a fax from the
                   Swedish Club dated 16th March, 1999 but only received
                   by the Charterers the following morning which read:

                   "We refer to the counter proposals for settlement of this matter
                   put forward by charterers.

                   Owners have duly noted those terms but are not prepared to
                   accept certain items. The following terms are put forward on a
                   "take or leave it" basis by owners and are not open to further
                   negotiation".

                   The fax went on to list 9 items and a response was
                   requested by return. The 9 items listed are those referred
                   to in the addendum, save for the reference in point 6 of the
                   addendum to the notice from Stephenson Harwood dated
                   18th March, 1999 which was subsequently agreed.

17/3/99            The Swedish Club sent a further fax to the Charterers
                   which reads:

                   "We refer to the counter-proposals for settlement of this matter
                   put forward by M.S. Shipping.

                   These are unacceptable to owners. If owners terms as set out in
                   our fax of yesterday evening are not agreed in writing by close
                   of business (GMT) today, then we will proceed as stated in
                   previous correspondence and in particular Stephenson
                   Harwood's notice of 15 March 1999.

                   We look forward to hearing from you".

Page 36

The Charterers replied by fax as follows:

"We accept your final proposal and shall be obliged if you will immediately fax the amount to be remitted with banking co-ordinates."

The Charterers sent a further fax to the Swedish Club later that day, reminding them that they were still waiting for a response.

By fax from the Swedish Club, the Charterers were informed of the amount to be remitted together with remittance details and were reminded that detention costs would continue to accrue until the settlement funds had been received. The fax also recorded a discussion regarding the formalities required for the surrender of the bills of lading for cancellation and the issuance of new bills of lading. The Charterers were advised that the Master would need to be presented with the new bills of lading at the discharge port and that the vessel would not move from her current position until the bills of lading were surrendered and new bills of lading had been issued.

| | |
|---|---|
| 18/3/99 | By fax, the Charterers provided the Owners with a copy of the swift advice evidencing the bank remittance details. Following further discussion between the parties regarding the practicalities of swapping the bills of lading, a proposal was transmitted by fax from the Owners' solicitors to the Charterers and copied, inter alia, to Zink and Triest SARL dated 18th March, 1999. The terms contained in the proposal were agreed to by the Charterers, by fax, on the following day. These terms were then incorporated into the addendum as reflected in clause 6 thereof. |
| 20/3/99 | The vessel arrived off the port of Mahajunga at 16.30 hours. |
| 22/3/99 | The Owners' solicitors sent an urgent fax to the Charterers which read inter alia: |

"As you are aware, it has been agreed by all parties that the Vessel will not proceed into the discharge port until owners' correspondent/agent has checked the original bills of lading. Furthermore, the charterers have agreed to cover all disbursements at the discharging ports.

We regret to inform you that although the vessel arrived at Mahajunga at 0630 hours on Saturday, 20 March, owners have not received any confirmation regarding the bills of lading, or that the local agents are placed in funds sufficient to cover the Vessel's disbursements.

...... In consequence, detention damages will continue to accrue in accordance with clause 1 of owners' proposal of 16th March 1999 ...."

In response thereto, Zink & Triest SARL sent a message to the brokers which I have not seen. However the following extracts were quoted in the Charterers Defence submissions:

"In reference to your questions concerning bill of lading for Mahajunga, I confirm that it arrived Friday at noon and was delivered on Saturday morning, it did not arrive as reported by Stephenson Harwood. These solicitors need to understand that they are dealing with a French speaking country. They therefore need to reconfirm things that may seem evident. This is true not only of oral communication but written ones as well."

"It therefore seems that the owners and their solicitors are deliberately frustrating our efforts to discharge in order to impose additional demurrage".

"We find the Owners are acting in bad faith".

| | |
|---|---|
| 23/3/99 | Following discussion between the parties and their brokers NOR was tendered at 17.00 hours. |
| 31/3/99 | Discharge was completed at 12.30 hours. |
| 1/4/99 | The addendum was signed by the Charterers. The vessel arrived at Antisirinana and NOR was tendered at 22.00 hours. |
| 5/4/99 | By fax dated 5th April, 1999, the Charterers were requested to pay US$ 15,437.50 representing detention charges for delay to the vessel whilst waiting off the port of Mahajunga. This amount was subsequently paid. |
| 10/4/99 | Discharge was completed at 12.00 hours. |

Page 38

12/04/99    The vessel arrived at Tamatave at 03.00 hours and NOR was tendered at 07.00 hours.

17/4/99    Discharge was completed at Tamatave at 11.15 hours.

<u>The Preliminary Issue</u>

65.    Throughout these proceedings the Charterers have challenged my jurisdiction to determine any disputes under the addendum to the charterparty. They have failed to provide me with any reasons save to the extent that they have argued that:

   i) the addendum is voidable for duress and
   ii) they have applied to the High Court of Sindh in Karachi, Pakistan for a determination of this issue and
   iii) that the matter is therefore sub judice.

66.    The Owners have argued that I do have jurisdiction to determine the disputes which have arisen under the charterparty and addendum thereto, in that the addendum was incorporated into and forms part of the charterparty. As such clause 54 of the charterparty applies to the charterparty as amended by the addendum.

67.    The Owners have pointed out that the Court proceedings in Pakistan were only brought after the commencement of the London arbitration proceedings and in addition, the Owners have argued that the Charterers have waived their right to challenge my jurisdiction, in that the Charterers have submitted to my jurisdiction by raising their defence of economic duress.

68.    <u>Findings and Reasons</u>

   I am satisfied that in accordance with the provisions of Section 30 and 31(b) of the Arbitration Act, 1996 I have jurisdiction to determine my own jurisdiction by dealing with the Charterers' objection, in this my award on the merits.

69.    Clause 54 of the charterparty provides for dispute resolution by way of London arbitration. The addendum does not contain a specific jurisdiction clause but Clause 8 of the addendum provides for the incorporation of the addendum into "the existing voyage charterparty". I therefore find that the addendum forms part of the charterparty as amended and any dispute under the addendum, including the issue as to

Page 39

whether or not the addendum is voidable for duress, is a matter for London arbitration with English law to apply.

70. The Charterers have conceded that I do have jurisdiction to determine their dispute with the Owners under the terms of the charterparty but not the addendum thereto. They have specifically admitted that I do have jurisdiction to consider their counter-claim under the terms of the charterparty, unamended by the addendum. I find that this concession by the Charterers does not constitute a waiver by them, of their challenge to my jurisdiction on the specific issue of whether or not the addendum is voidable on the grounds of economic duress.

71. Furthermore, I find that the service of the Charterers' Defence submissions and Counterclaim does not in itself amount to a waiver of their challenge to my jurisdiction, in that the Charterers made their position clear from the outset of these proceedings viz. that they do not recognise my jurisdiction to determine any dispute under the addendum, and in particular whether or not the addendum is binding upon them.

72. I have some difficulty with the Charterers' explanation for their refusal to acknowledge my jurisdiction to determine any dispute arising under the addendum, in that the arbitration proceedings had been commenced, and the Owners' claim submissions had been served, some weeks before the Charterers brought their application in the High Court of Sindh. I find therefore that, in the absence of the intervention of the English High Court, it is I who should first decide whether or not I have jurisdiction, and that the proceedings before the High Court of Sindh should be stayed, pending my determination. No injunction was served on me and I have therefore now accordingly, proceeded to this my final award.

Conclusions

73. Having carefully considered all of the evidence and the submissions made by and on behalf of the parties I hereby FIND AND CONCLUDE that the Charterers have not waived their right to challenge my jurisdiction insofar as it relates to my consideration of whether or not the addendum is voidable on the grounds of economic duress, but that I nevertheless do have jurisdiction to determine the disputes which have arisen under the charterparty and addendum.

74.   Economic duress

The primary dispute between the parties is whether or not the addendum is voidable for duress. The Charterers have argued that it is. The Owners disagree.

75.   The Charterers' Arguments

75.1   The Charterers have argued that they were subjected to illegitimate pressure from the Owners. They have submitted that the Owners started to make unreasonable demands as soon as they became aware that the government of the Cormores Islands had refused permission to discharge the cargo.

75.2   While the Charterers were trying to resolve the problem with the cargo receivers, the Owners continually pressured them into agreeing to pay for the delay to the vessel, in breach of the provisions of the charterparty and in particular clause 43 of the charterparty, which provided for the payment of demurrage 30 days after the submission of documents after discharge of the cargo.

75.3   In an attempt to prevent further delay to the vessel, a proposal was put to the Owners by fax on the 8th March 1999, only to be faced with a refusal by the Owners to co-operate, together with unreasonable demands for compensation.

The Charterers' interpretation of events was in their view reinforced by their broker's fax message to the Owners' brokers on the 10th March, 1999.

75.4   The Charterers have argued that their proposal by fax on the 12th March, was fair and reasonable, bearing in mind that the delay at Moroni had arisen due to government intervention which constituted "force majeure". Instead, the Owners' refused to accept their terms and "to further harass and threaten" the Charterers, the Owners' solicitors called for London arbitration.

75.5   On the 16th March 1999, the Swedish Club conveyed the Owners' settlement proposal on the basis of "take it or leave it" i.e. they made it clear that the Owners were not prepared to continue negotiating. In this situation the Charterers believed that they had no choice but to accept the Owners' "illegal, unjustified, and unreasonable demands".

75.6.   Although the Charterers tried to re-open the negotiations, on the 17th March 1999, the Swedish Club informed them that the Owners had refused their counter- offer. Instead, the Owners imposed a deadline of that day for acceptance of their offer, failing which they would proceed to arbitration.  At this point the Charterers capitulated and agreed to the Owners' terms but even then, the Owners "deliberately frustrated their attempts to discharge the cargo" in Mahajunga "in order to impose additional demurrage".

75.7    The Charterers have argued that the Owners were acting in bad faith when they delayed discharge at Mahajunga, pending receipt of confirmation of the arrival of the bills of lading, thereby running up further detention charges in the amount of US$15,437.50 which the Charterers were forced to pay.

75.8    The Charterers have submitted that they showed that they were willing to honour and be bound by the terms and conditions of the charterparty whereas the Owners just wanted to amass money.  Those parties with an interest in the cargo did their utmost to discharge the cargo at Moroni, and when the Owners were asked to agree to alternative arrangements, they proved to be wholly intransigent and started to make unreasonable demands.   The Owners refused to extend the terms of the charterparty to cater for the additional ports and instead sought to renegotiate the terms of the charterparty.

75.9.   Finally and whilst under duress the Charterers felt that they had to agree to the Owners' terms as they had no other choice.  The Owners had control of the cargo and as further delay would continue to cost the Charterers, they agreed to the Owners' terms. "No amount of reasoning seemed sufficient in making the Owners realize that their actions were tantamount to blackmail and that all acts of theirs were motivated by greed and mala fide intention."

75.10   The Charterers have counter-claimed an amount of US$ 128,464.65 which they calculate represents the balance due to them in accordance with the terms of the charterparty.  They have reached this figure by, inter alia, applying half of the demurrage rate to the time lost whilst waiting off Moroni, in accordance with the provisions of clause 15 of the charterparty.

76.   The Owners' Arguments

76.1   The Owners have argued that they were not unreasonable. The "Charterers had not organised or prepared for discharge of the cargo at Moroni and repeatedly and recklessly asked the Owners to take the vessel into Moroni to discharge without official government permission" to do so. The Charterers' fax of the 24th February was intended to deliberately mislead the Owners.

76.2   In the absence of agreement, the Charterers had no right to nominate further discharge ports in Madagascar under the terms of the charterparty and the Owners were becoming increasingly concerned about the whereabouts of the bills of lading and the Charterers' failure to resolve the problem.

76.3   They deny that they threatened or harassed the Charterers or that the terms of the settlement were illegal, unjustified or unreasonable. By the 16th March, 1999, the vessel had been sitting off Moroni for 21 days and the Charterers had had sufficient time to make a proposal which would be acceptable to the Owners.

76.4   There was no provision in the charterparty which entitled the Charterers to declare "force majeure" and thereby stop laytime and/or demurrage from running and the Owners' demands for payment of detention damages and other expenses incurred arising out of the delay at Moroni were legally justified in that the Charterers were in breach of the charterparty.

76.5   The addendum which was agreed to and signed by the Charterers is binding upon them and they cannot now complain that it is voidable for duress, just because they consider it to be a bad bargain.

76.6   Both the Owner and the Charterers are commercial entities with experience in the sphere of carriage of goods at sea. They were in equal bargaining positions. Against the background of the Charterers' inactivity, the lack of information from the Charterers and the need to speak to the shippers of the cargo, Zinc & Triest SARL in Paris so as to ensure that the cargo was delivered to the correct party claiming title to the goods, it was necessary for the Owners to establish some order over the matter and to negotiate amended terms to the charterparty.

The Owners point out that whilst the vessel was waiting off the port of Moroni they had not seen the original bills of lading and did not know

Page 43

where they were, who held them, and in what capacity they were held. The Owners were put in a very difficult position due the Charterers lack of instructions.

76.7   In addition the Owners rely on the words of Mr Justice Mance in Huyton S.A. v Peter Cremer G.m.b.H. & Co. [1999] 1 Lloyd's Rep 620 at 638 when he stated that "relief may perhaps also be refused" to a party claiming economic duress "if he has made no protest and conducted himself in a way which showed that, for better or for worse, he was prepared to accept and live with the consequences, however unwelcome."

They submit that this was the case here, in that, whilst the Charterers made some initial protests, they eventually agreed to and signed the addendum to the charterparty and then only filed the Court application in Karachi at the end of July 1999, several months after the agreement was concluded and one month after the claim submissions in the arbitration proceedings were served by the Owners.

76.8   At no stage did either party treat the contract as frustrated.

76.9   The General Strike Clause viz. clause 15 of the charterparty is inapplicable and the Charterers are, in any event, bound by the terms of the addendum to which they agreed.

Discussion and Reasoning

77.   The decision by the government of the Cormores Islands to refuse to allow the cargo to be discharged does seem to raise questions relating to the applicability of the doctrine of frustration under English law. The Charterers seem to have alluded to this when they referred to "force majeure" in their fax of the 15th March, 1999.

78.   I was not provided with any explanation as to the cause for the government's decision to refuse permission to discharge the cargo. I agree with the Owners that neither party treated the contract as frustrated and as neither party has developed an argument based on the English law doctrine of frustration, I am not in a position to form a view on this. Indeed, from the Owners' standpoint this may be fortunate, if the Charterers were in no way at fault.

79.   Instead, both parties appear to have proceeded on the basis of the subsisting charterparty contract and it therefore falls to me to consider whether or not the addendum which was agreed to by the parties is voidable for economic duress, absent frustration of the charterparty.

80. The Charterers have argued that the Owners' actions were mala fides and that they were harassed and threatened into accepting the Owners illegal and unjustified demands.

81. Having carefully considered all of the evidence, I find that the Owners were acting in good faith, although both parties appear to have been suspicious of each others motives as soon as the vessel was prevented from berthing at Moroni.

82. The Owners seemed to doubt the Charterers' ability or willingness to pay either damages for detention or demurrage. This no doubt stemmed, at least partially, from the fact that the Charterers were late in paying the balance of freight due to the Owners and was probably reinforced subsequently when the Charterers refused to provide voluntary security. Furthermore, the Charterers' attempts to mislead the Owners by fax on the 25th February would not have helped engender trust between the parties.

83. The Charterers seemed to think that the Owners were being deliberately obstructive possibly with a view to obtaining a financial advantage (particularly since the Charterers believed that they had laydays still at their disposal to do with as they pleased). The result was that when the Charterers finally sought to resolve the impasse through negotiation, the Owners adopted a fairly uncompromising stance and insisted upon what I would describe as a "tough bargain".

84. Whatever the parties' suspicions may have been, I am satisfied however, based on the evidence before me that both parties were negotiating in good faith.

85. This then raises the issue of whether or not the Owners applied illegitimate pressure, thereby forcing the Charterers into the agreement evidenced by the terms of the addendum. If so, the addendum is voidable for duress.

86. Having elected and agreed to discharge the cargo at two ports, under the terms of the charterparty, I find that the Charterers were not entitled to nominate a third or additional port(s) to discharge the cargo. They would need to obtain the Owners' agreement to do so.

87. The exchanges between the parties to which I have referred in the chronology of events demonstrates that the Owners did exert considerable pressure on the Charterers to either, obtain government permission to discharge the cargo at Moroni or, agree terms with the Owners for the

discharge of the cargo at an alternative port(s). They did so by imposing numerous deadlines, by continually reserving their rights, by threatening arbitration and legal proceedings and ultimately on the 16th March by making a final offer to discharge the cargo at Mahajunga, Antisiranana and Tamatave, on a "take it or leave it" basis.

88.    I recognise that by this point in the negotiations the Charterers felt that they had no other option but to accept the Owners terms. I believe the Charterers when they state that they felt pressured into accepting the Owners' terms. However, the issue for me to decide is whether or not the pressure which was exerted by the Owners, was illegitimate.

89.    I find that the pressure exerted by the Owners was, in my opinion legitimate and part of the cut and thrust of tough negotiations between two commercial entities.

Both parties were entitled to and indeed appear to have sought legal advice. The fax from Zink and Triest SARL dated 16th March, 1999 demonstrates that the Charterers were advised to "settle this."

90.    I find that although the Charterers perceived themselves to be in a weaker bargaining position than that of the Owners, this does not entitle the Charterers to now avoid the addendum to which they agreed. Commercial contracts are often concluded by parties in circumstances where one of the parties may perceive himself to be in a weaker bargaining position. It would be wholly unsatisfactory in my view, if such contracts were held to be voidable for economic duress on such grounds.

91.    Furthermore whilst the Charterers were undeniably unhappy with the terms being offered by the Owners, I find that they were neither unreasonable nor unlawful, in the circumstances.

92.    The Owners' quantified their damages for detention at the demurrage rate plus the cost of bunkers consumed. The Charterers have argued that this was unreasonable and that the provisions of clause 15 of the charterparty applied viz. that the Owners were only entitled to be paid demurrage and then at half of the demurrage rate.

I find that the delay to the vessel was not caused as a result of a strike or lock-out and that clause 15 of the charterparty was therefore inapplicable to the facts of this case. Furthermore the Charterers have failed to produce any evidence to demonstrate that damages for detention at the

demurrage rate plus the cost of bunkers consumed, was unreasonable, and, in the absence of any evidence to the contrary, I find that the Owners' figures are reasonable.

93. The Owners sought reimbursement for the funds which they had advanced to their agents in Moroni in return for which they agreed to assign the funds to the benefit of the Charterers. Again, I find that there is nothing unreasonable with this request. The additional freight demanded in return for discharging the cargo at Mahajunga, Antisirinana and Tamatave was reasonable and in fact, no more than that originally required under the charterparty i.e. US$ 1.50 per m.t. on the entire cargo for each additional discharge port used.

94. The Owners' claim for demurrage is more problematic. During the course of negotiations the Owners argued that demurrage had been earned at the first discharge port of Antsirinana. I have not seen the Owners' calculations in this regard, but it would seem to me that demurrage could not have been earned, given the provisions of clause 31 of the charterparty. The Owners may have made separate calculations for each discharge port and if so, the Charterers do not appear to have noticed the Owners' mistake of law at the time, in that it does not appear to have been drawn to the Owners' attention by the Charterers (at least not from the documents which have been produced). I therefore find that the Owners were not acting in bad faith when they, perhaps erroneously, requested the payment of demurrage at the first discharge port of Antsirinana.

95. Insofar as the Owners insisted on agreeing terms which would provide for the advance payment of any amounts due, and that the disbursement accounts be paid by the Charterers (excluding Owner's terms), this too seems to me to be a reasonable request, given the Charterers' earlier refusal to provide security. I therefore find that the Owners' demand for payment in advance was reasonable.

96. Finally, the Owners' insisted on provisions in the addendum which would protect them from claims for misdelivery under the bills of lading, and they took the opportunity to re-negotiate the laytime provisions in the charterparty, to which the Charterers agreed. I find nothing unreasonable or unlawful with this. In fact, the Owners' concerns regarding the surrender and cancellation of the bills of lading and the need to deliver the cargo against newly issued bills of lading were forseeable.

97. By agreeing to the terms proposed by the Owners in the Swedish Club's

fax dated 16th March, 1999, the Charterers agreed that new bills of lading would need to be issued forthwith, in exchange for the existing bills of lading in relation to the cargo still to be discharged. The manner in which the bills of lading would need to be exchanged required further discussion. These discussions culminated in an agreement on the 18th March, 1999 which was subsequently incorporated into clause 6 of the addendum.

98.   The Charterers have argued that the Owners' demand for a further payment for damages for detention arising out of the delay to the vessel pending the arrival of the bills of lading, was motivated by greed and that the Owners were acting in bad faith.

99.   Insofar as I have found that the amount claimed by the Owners as damages for detention, was reasonable, I find that the Owners' request for payment for delay to the vessel pending the arrival of the bills of lading and confirmation from the cargo receivers, was also reasonable. The Charterers failed to produce any evidence to establish that the Owners deliberately obstructed or delayed the production of the bills of lading, so as to persuade me that the Owners were acting in bad faith.

100.  To summarise, I find that the Owners did not exert illegitimate or unlawful pressure on the Charterers so as to force the Charterers to agree to the terms of the addendum. I find that the Charterers could have refused the terms on offer, which would have left the Owners with the difficult decision of how best to deal with the cargo remaining on board the vessel. Furthermore, the Charterers could have agreed to an urgent arbitration hearing, or sought the assistance of the English High Court. They could even have suggested the appointment of a mediator in order to break the perceived impasse in negotiations or have offered to deposit the amounts in dispute into an escrow account. Instead, the Charterers decided to agree to the Owners' terms.

101.  As I have found that the addendum was not concluded under economic duress, there is no need for me to consider the Owners' alternative argument that relief should be refused to the Charterers due to their subsequent conduct.

Findings and Conclusion

102.  Having carefully considered all of the evidence before me and the submissions made by and on behalf of the parties I FIND AND CONCLUDE that the addendum was not concluded under economic

Page 48

duress. In the absence of any duress, the provisions of the addendum apply. It follows that the Charterers counter-claim must fail.

Quantum

103. With 7,000 MT on board, and pursuant to clause 7 of the Addendum, the allowed laytime was nine days eight hours i.e. 7000 M.T./750 MT per day or pro rata.

104. The vessel arrived off the port of Mahajunga on the 20th March 1999 and berthed on the 23rd March, 1999. NOR was tendered at 17.00 hours and a total of 2.000 mts of cargo was discharged, completing on the 31st March at 12.30 hours. Pursuant to clause 7 of the addendum laytime commenced at 17.00 hours on the 20th March, 1999 and continued uninterupted until the completion of discharge at Mahajunga. The total time used at Mahajunga was 7 days 19 hours 30 minutes.

105. The vessel arrived and tendered NOR at Antisirinana on 1 April, 1999 at 22.00 hours where she proceeded to discharge 3,000 m.t. of bagged rice, completing discharge at 12.00 hours on the 10th April, 1999. Laytime commenced at 22.00 hours on the 1st April, 1999, and continued to run uninterupted until expiry on 3rd April at 10.30 hours when the vessel came on demurrage. The total time on demurrage at Antisirinana was 7 days one hour 30 minutes.

106. The vessel tendered NOR at the final discharge port of Tamatave on the 12th April at 03.00 hours and completed discharging the remaining 2,000 m.t. of rice at 15.15 hours on the 17th April. The vessel was on demurrage throughout this period viz. 5 days 12 hours 15 minutes.

107. The total period on demurrage was 12 days 13 hours 45 minutes or 12.5729 days. At a demurrage rate of US$ 4,750 the total demurrage earned was US$ 59,721.35.

108. Clause 37 of the charterparty entitles the Charterers to deduct brokerage and commission. Box 20 and Clause 14 of the charterparty provides for a brokerage commission on demurrage at the rate of 6.25% for division, which I calculate to be US$ 3,732.58. The Owners are therefore entitled to the payment of demurrage net of brokerage commission in the amount of US$ 55,988.77 and no more.

109. Section 49 of the Arbitration Act, 1996 gives the Tribunal the power to award simple or compound interest from such dates, at such rates and with such rests as it considers meets the justice of the case.

110.    In accordance with the provisions of clause 43 of the charterparty demurrage, if any, was to be settled within 30 days after submission of documents after completion of discharge.   On 20th April, 1999, the Owners' managers, Transocean Marine Management S.A., sent the Owners' laytime statement to the Charterers via broking channels together with supporting documents, showing demurrage due and payable to the Owners in the amount of US$ 59,721.35.   Although the Charterers deny having received same until after the commencement of these proceedings, based on the evidence submitted by the parties, I am satisfied that this was not the case. The 30 day period for payment accordingly expired on the 20th May, 1999.   In the circumstances it seems to me to be appropriate to award interest on the sum awarded, viz. US$ 55,988.77 at the rate of 7.50% per annum, compounded on a quarterly basis, and payable for the period from 21st May, 1999 until the date of payment.

111.    I see no reason to depart from the general rule that costs should follow the event.   Having been successful the Owners are entitled to recover their costs as well as the costs of the Tribunal if they have borne them in the first instance.   I reserve to myself the power to determine the Owners' costs if they cannot be agreed between the parties.

112.    **NOW I**, the said Sonja Fink  having taken upon myself the burden of this reference, and having considered the written evidence and arguments submitted to me, **DO HEREBY MAKE, ISSUE AND PUBLISH** this my **FINAL AWARD** as follows:-

A)    **I FIND AND HOLD** that the Owners' claim for US$ 59,721.35 succeeds to the extent of US$ 55,988.77 and no more.

B)    **I THEREFORE AWARD AND DIRECT** that the Charterers shall forthwith pay to the Owners US$ 55,988.77 (United States Dollars Fifty Five Thousand Nine Hundred and Eighty Eight and Seventy Seven Cents) together with interest thereon at the rate of 7.50% per annum compounded at quarterly rests from the 21st May, 1999 until the date of payment.

C)    **I FURTHER AWARD AND DIRECT** that the Charterers shall bear and pay their own and the Owners' costs of the reference (the latter to be determined by me if not agreed, for which determination I hereby reserve my jurisdiction) and that the Charterers shall bear and pay the costs of this my Final Award in the sum of £ 4,800.00 (Four Thousand Eight Hundred Pounds Sterling), inclusive of my fees, interlocutory charges and

Page 50

disbursements PROVIDED, however, that if, in the first instance, the Owners shall have paid all or any part of the costs of this my Final Award, they shall be entitled to an immediate reimbursement by the Charterers of the sum so paid, together with interest thereon, calculated at the rate of 7.50% per annum compounded at quarterly rests, from the date of payment until the date of reimbursement.

**GIVEN** under my hand in London, England this 21st day of December, 1999.


**Sonja Fink**                                          **Witness**

IN THE MATTER OF THE ARBITRATION ACT 1996

AND

IN THE MATTER OF AN ARBITRATION

BETWEEN:

FLAME MARITIME LIMITED of  Valletta, Malta

**Claimant**
(Owners)

AND

M/s. HASSAN ALI RICE EXPORT COMPANY of Karachi, Pakistan

**Respondents**
(Charterers)

m.v. "JUNIOR M"

Charterparty dated 29th January, 1999

# FINAL ARBITRATION AWARD AND REASONS